# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

_____

No. 00-60754

_____


EXXON CORPORATION, A New Jersey Corporation

Plaintiff-Appellant,

VERSUS


CROSBY-MISSISSIPPI RESOURCE, LTD, a Mississippi Limited Partnership;
LYNN CROSBY GAMMILL, General Partner; STEWART GAMMILL, III, General Partner:
STEWART GAMMILL, III, as successor Trustee for Steward Gammill IV, Trust Number 2;
LUCIUS OLEN CROSBY GAMMILL, Trust Number 2;
JENNIFER LYNN GAMMILL, Trust Number 2; LUCIUS OLEN CROSBY GAMMILL;
STEWART GAMMILL, IV; JENNIFER LYNN GAMMILL;
STEWARD GAMMILL, III, as successor Trustee for Steward Gammill IV,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Mississippi
(3:89-CV-627 (B)(N))

_____

December 28, 2001

Before GARWOOD, DAVIS, and MAGILL,[*] Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[**]

This appeal arises out of a dispute over the interpretation of the terms of an Exploration

_____

[*] Circuit Judge for the Eighth Circuit, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

Agreement between Exxon Corporation ("Exxon") and Crosby-Mississippi Resources, Ltd., et al ("CMR"), initiated over twelve years ago. This is the third time issues from this case have been presented to us. This appeal is a continuation of the issues addressed in our prior published opinion, *154 F.3d 202* (1998)(*Exxon I*).[1] For the following reasons we affirm the district court in part and reverse in part.

## I.

The history of this dispute is reported in detail in our prior opinion. To aid the reader, we will summarize those facts relevant to this appeal, supplemented as necessary to explain the new issues that have arisen since that opinion. In 1983, Exxon and CMR entered into a joint oil and gas Exploration Agreement to develop their respective mineral resources in an area of Mississippi. Exxon held oil and gas leases covering more than 60,000 acres in the contract area, while CMR owned approximately 20,000 mineral acres in the contract area. Both Exxon and CMR contributed what they owned to the joint oil and gas exploration effort. The parties agreed that Exxon contributed 76% and CMR 24% of the oil and gas interests in the contract area. Under the terms of the Exploration Agreement, Exxon had the exclusive right to propose the first exploratory well. CMR could choose to participate in the exploratory well up to its 24% contractual share. If CMR chose to participate, it was required to bear its proportionate share of the costs of the drilling, testing, completion, and production expenses of the well. By doing so, CMR would be entitled to 24% of the well's commercial production. If CMR chose not to participate, however, CMR was still entitled

---

[1] Another panel of this court addressed issues unrelated to this appeal in an unpublished opinion.

to a royalty on any of its unleased mineral interests included in the drilling unit [2] for each well and to an "overriding royalty" under provisions which are further explained below.

A substantial number of wells were drilled by the parties. CMR participated in some but not in others. Almost from the beginning the parties disagreed over a number of issues. The disagreements eventually led to the filing of this action by Exxon in 1989 to collect amounts it claims are due from CMR for its share of various expenses. CMR filed a counterclaim alleging numerous claims of its own.

The dispute in *Exxon I* arose in part regarding the effect of Paragraphs 7 [3] and 8 [4] of the

---

[2] The Exploration Agreement defines a drilling unit as "the area fixed for the drilling of one well by order or rule of any state or federal body having authority."

[3] Paragraph 7 of the Exploration Agreement read in pertinent part:
Each PARTY receiving proper notice . . . of a PROPOSED EXPLORATORY WELL . . . shall have thirty (30) days after receipt of said notice within which to notify the proposing PARTY if said receiving PARTY elects to participate in the cost of the PROPOSED drilling as to all or any part of its CONTRACTUAL INTEREST and other interest; and failing an affirmative election . . . each NON-CONSENTING PARTY shall by this EXPLORATION AGREEMENT agree that the CONSENTING PARTIES shall have the right to earn the NON-CONSENTING CONTRACTUAL INTEREST of each NON-CONSENTING PARTY, . . . . As to each EXPLORATORY WELL, the CONSENTING PARTIES who CARRY their part of the NON-CONSENTING CONTRACTUAL INTEREST shall . . . be entitled to the production from said well which would have been attributable to said NON-CONSENTING PARTY's CONTRACTUAL INTEREST had said NON-CONSENTING PARTY participated as to said CONTRACTUAL INTEREST, subject, however, to any and all royalty due under the LEASE, calculated on said NON-CONSENTING PARTY's actual unleased mineral interest, and to an overriding royalty of one eighth (1/8) of eight eighths (8/8) of production allocated to the PARTIES, without any reduction for any royalties and /or any other burdens, and calculated on said NON-CONSENTING PARTY's CONTRACTUAL INTEREST percentage . . . and subject to the right of CONVERSION OPTION AT PAYOUT.

[4] Paragraph 8 of the Exploration Agreement reads in pertinent part:
If at the time each NEW EXPLORATORY WELL IS PROPOSED . . . then the

Exploration Agreement to certain properties acquired by Exxon after the inception of the agreement. Under paragraph 7, if Exxon drilled an exploratory well and CMR did not participate, CMR, however, was still entitled to a 1/8 "customary royalty"[5] if it owned the "actual, unleased mineral interests" in the drilling unit. Moreover, Paragraph 7 of the contract provided CMR with an additional 1/8 "overriding royalty" interest on "production allocated to the parties . . . calculated on . . . the non-consenting party's[6] contractual interest percentage." Thus, in the simplest case -- where

CONSENTING PARTY shall by earning the NON-CONSENTING PARTY's CONTRACTUAL INTEREST in said EXPLORATORY WELL likewise earn the NON-CONSENTING PARTY's rights to said NON-CONSENTING CONTRACTUAL INTEREST to propose, drill, and complete or plug and abandon DEVELOPMENT WELLS which are drilled in OFFSETTING CONTRACT UNITS to said EXPLORATORY WELL, provided that no more than one hundred and eighty (180) days shall elapse between the date said EXPLORATORY WELL is COMPLETED or PLUGGED AND ABANDONED and the actual commencement of drilling of the first DEVELOPMENT WELL drilled in an OFFSETTING CONTRACT UNIT to said EXPLORATORY WELL, and then between said first such DEVELOPMENT WELL and the commencement of the drilling of the second, and so on, on a continuous basis, . . . . The CONSENTING PARTIES who CARRY said NON-CONSENTING PARTY's INTEREST in that portion of the OFFSETTING CONTRACT UNIT or UNITS to said EXPLORATORY WELL which is included in the CONTRACT UNIT for each such DEVELOPMENT WELL shall thereby earn and be entitled to receive said NON-CONSENTING PARTY's share of the production attributable to said portion, subject, however, to any and all royalties due under the LEASE, calculated on said NON-CONSENTING PARTY's actual unleased mineral interests, and to an overriding royalty of one eighth (1/8) of eight eighths (8/8) of production allocated to the PARTIES, without any reduction for any royalties and /or any other burdens and calculated on said NON-CONSENTING PARTY's CONTRACTUAL INTEREST . . . and subject to the right of CONVERSION OPTION AT PAYOUT. . . .

[5] Under the majority of oil and gas leases, it is "customary" that the lessor retains a royalty interest consisting of a fraction of the gross amounts of oil or gas produced. This customary royalty interest is often a 1/8 interest.

[6] The Exploration Agreement defines a consenting party as "a party who agrees to join in and pay its share of the drilling cost of any operation conducted under the provisions of this agreement."

4

both parties collectively possessed 100% of the interests underlying a particular exploratory well and CMR elected not to participate in the drilling of that well -- CMR would still receive an overriding royalty of 1/8 of 24% of the 100% joint interests of Exxon and CMR.

If, under Paragraph 7, Exxon earned CMR's interest in an exploratory well, Paragraph 8 permitted Exxon to earn CMR's interest in any offset wells to the exploratory well, called "development wells," under certain conditions. If Exxon met the conditions, it could earn CMR's interest in the development wells, subject to CMR's customary 1/8 royalty (if CMR owned the "actual unleased mineral interests") and the 1/8 overriding royalty on "production allocated to the parties." Exxon timely commenced drilling on the first exploratory well, Southern Minerals No. 1. CMR chose not to participate. This well was successful and produced gas. Exxon then drilled the first development well for Southern Minerals No. 1, called Southern Minerals No. 2, and a second development well, called Crown-Zellerbach No. 24-11. Exxon ultimately drilled six more wells in the area, which are not relevant to this appeal.

Unlike our simple example, Exxon and CMR did not own all of the drilling rights throughout the Contract Area governed by the Exploration Agreement between them. It is not unusual in this circumstance for the parties desiring to drill to acquire the outstanding interests from the third parties who own unleased and outstanding interests. If those mineral interests are already under lease, the parties desiring to drill may purchase the leases from the holders of the leases. If the parties holding such leases wish to participate in the well, the leaseholders may "farm-out" their leased interest to the parties desiring to drill the well. In such an event the contract is structured so that the purchaser or

By contrast, a non-consenting party is "a party who elects not to participate in a proposed operation." For all issues addressed in this appeal, Exxon is the consenting party and CMR is the non-consenting party.

5

farmee acquires an interest in the lease by successfully drilling a well to a specified depth. When the original leaseholder of a mineral lease sells (or "farms-out ") its mineral rights to a purchaser wishing to drill in the leasehold, the purchaser acquires a "farm-in."

Subsequent to the signing of the Exploration Agreement, Exxon acquired "farm-ins" from Cities Service Company, Clayton W. Williams, Jr. and David Smith (the "Farm-in Acquisitions"). Under the terms of paragraph 13 of the Exploration Agreement, CMR had the right to participate in these acquisitions up to its Contractual Interest by paying its share of the costs to drill the wells required to accomplish these farm-in acquisitions.[7] CMR did not participation in any of the Farm-in Acquisitions

In the first bench trial, the trial court ruled that Exxon had earned CMR's interests in the disputed areas but also ruled that the contract unambiguously required Exxon to pay CMR the 1/8 overriding royalty on gas production attributable to the farm-ins that Exxon acquired after the inception of the Exploratory Agreement. Because this first issue controlled many of the later disputes between the parties, the district court certified its ruling for immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure. Exxon appealed that ruling. A panel of this court "vacated the decision of the district court that the Exploration Agreement is unambiguous with respect to whether CMR is entitled to an overriding royalty on Exxon's farm-in acquisitions" and remanded the case "for

_____

[7] Pursuant to Paragraph 13 of the Exploration Agreement, ". . . it is agreed that, as to any ACQUISITION, the acquiring PARTY shall notify all other PARTIES promptly of the terms and conditions of each such ACQUISITION, and said other PARTIES shall have thirty (30) days following receipt of notice in which to elect to participate in each such ACQUISITION, for the dollar price paid and/or possible participation in the drilling of a WELL, if that be required to earn a farmout, retroactive to and effective as of the date of such ACQUISITION, and according to the CONTRACTUAL INTERESTS of the PARTIES . . . and all ACQUISITIONS shall otherwise be subject to this EXPLORATION AGREEMENT."

the consideration of parol evidence to determine the parties' intent with respect to this issue." On remand, the district court held a two day bench trial. Following the trial, the district court found "that it was the intent of the parties that CMR was to be entitled to a one-eighth overriding royalty on production from the farm-ins acquired solely by Exxon."

A second issue arose after the district court made the ruling described above. The parties disagreed as to whether CMR had the right to exercise the Conversion Option at Payout as to CMR's overriding royalty interest on Farm-in Acquisitions. The Exploration Agreement defines Conversion Option at Payout as "the option that each NON-CONSENTING PARTY shall have, as to each NON-CONSENTING CONTRACTUAL INTEREST, to continue to receive the overriding royalty provided for in PARAGRAPHS 7 and 8 of the EXPLORATION AGREEMENT or to exchange said overriding royalty for 50% of the participating CONTRACTUAL INTEREST said NON-CONSENTING PARTY would have owned had said PARTY participated in said WELL as to said CONTRACTUAL INTEREST. . ." This new Issue Ten was submitted to the district court on motions for summary judgment. By an Opinion and Order dated July 18, 2000, the district court found that "CMR is not judicially estopped from asserting a right to Conversion Option at Payout" and granted CMR's motion for summary judgment, finding that CMR does have a Conversion Option at Payout as to the subject overriding royalty interests, and that CMR had timely exercised that option.

Exxon challenges both decisions of the district court.

II.

Exxon argues first that the district court erred in concluding that CMR is entitled to an overriding royalty interest under Paragraphs 7 and 8 of the Exploration Agreement as to production

7

from Farm-in Acquisitions acquired solely by Exxon, specifically the Cities Service Company, Clayton W. Williams, Jr. and David Smith farm-ins. We start our analysis, as we must, with the conclusion reached in *Exxon I*, that the agreement itself is ambiguous on this issue. On remand, the district court concluded on the basis of the parole evidence presented to it, that CMR carried its burden of proof and that the parties intended to give CMR a one-eighth overriding royalty interest on all production allocated to the parties, including production from the Farm-in Acquisitions. The district court's decision on this issue is a factual one, which is subject to review for clear error.[8]

The district court gave great weight to the testimony of Mr. Gammill, CMR's representative in the negotiations. Mr. Gammill testified directly that it was his intention on behalf of CMR to have the provisions in question cover all acquisitions, including acquisitions obtained solely by Exxon. Proposed revisions to the documents in Mr. Gammill's handwriting, which Exxon accepted, support his testimony. Although the agreement as interpreted by the district court is not consistent with common practices in the industry, neither was the negotiating position of the parties. Because of CMR's extensive mineral interest holdings in the prospect area and CMR's refusal to lease its acreage to Exxon, Exxon was compelled to negotiate the Exploration Agreement with a mineral owner, which it does not ordinarily do. Also, due to the impending expiration of many of Exxon's leases within the prospect, Exxon was under time pressure to obtain an agreement with CMR. Although the record contains evidence that would point to the opposite conclusion, including testimony of other witnesses, conduct of the parties and the language of the agreement itself, the district court's conclusion has evidentiary support and is not clearly erroneous.

A significant portion of Exxon's argument on this issue is devoted to its position that there

---

[8]  Baldwin v. Stadler, 137 F.3d 837, 839 (5th Cir. 1998).

can be no overriding royalty interest in favor of CMR on the Farm-in Acquisitions without express language of grant or reservation. Whatever the merits of those arguments, they did not carry the day in *Exxon I*, and we are precluded from revisiting these arguments dealing with the plain language of the agreement.

III.

Exxon argues next that the district court erred in concluding that CMR is entitled to convert to a working interest the overriding royalty interests attributable to Exxon's Farm-in Acquisitions which it acquired after execution of the Exploration Agreement. This panel is in a procedurally different position on this issue than on the first issue. *Exxon I* did not address this question. Accordingly, our review of the contractual language of the Exploration Agreement and the district court's interpretation of the contract is *de novo.*

The Exploration Agreement defines the Conversion Option at Payout as "the option that each NON-CONSENTING PARTY shall have, as to each NON-CONSENTING CONTRACTUAL INTEREST, to continue to receive the overriding royalty provided for in PARAGRAPHS 7 and 8 of the EXPLORATION AGREEMENT or to exchange said overriding royalty for 50% of the participating CONTRACTUAL INTEREST said NON-CONSENTING PARTY would have owned had said PARTY participated in said WELL as to said CONTRACTUAL INTEREST. . ." Simply stated, CMR's position is that if they are entitled to an overriding royalty as to an interest, they are entitled also to the Conversion Option. CMR argues that the district court correctly concluded that because CMR is entitled to the overriding royalty interest as to Exxon's Farm-in Acquisitions, CMR is also entitled to convert that overriding royalty interest into a working interest in those separately

9

acquired properties under the terms of the option. We disagree.

CMR's interpretation merges two distinct features of the Exploration Agreement. CMR's entitlement to an overriding royalty derives from Paragraphs 7 and 8 of the agreement which deal with the drilling of Exploratory and Development Wells. Those paragraphs set forth the rights of CMR to participate in proposed wells and the consequences of not doing so. If CMR elects not to participate in drilling a well, or if by not participating in an exploratory well CMR loses its right to participate in the drilling of subsequent development wells, Exxon earns CMR's interest in the wells with CMR retaining an overriding royalty interest in the prospects. In this circumstance, when CMR does not participate in the drilling costs, Paragraphs 7 and 8 have the effect of requiring CMR to exchange its rights to production from its Contractual Interest in properties included in the unit as a method of compensating Exxon for bearing all the drilling costs and risks. Once these wells pay out, CMR retained the option to exchange the overriding royalty for a working interest equal to one-half of the working interest it would have had if it had participated. Thus, all of these provisions deal with the forfeiture and earning of rights between the parties as to properties each contributed to the venture.

A separate provision, Paragraph 13, deals with acquisitions of mineral interests by the parties within the contract area after the inception of the agreement. Under Paragraph 13, each party has the right to participate in the acquisition of an interest by another party within the contract area by paying its share of the acquisition price. In the case of the Cities Service, William, and Smith farm-ins, Exxon's acquisition price was the cost of drilling a well to meet the specifications of the farm-ins. As to these farm-ins, CMR did not participate in the drilling of the wells required to meet the terms

of the farm-in.[9]  Accordingly, CMR had no interest in these separately acquired properties that would be subject to the forfeiture / retention features of Paragraphs 7 and 8.

CMR's argument that it is entitled to convert the overriding royalty interest on Exxon's separately acquired farm-ins under the Conversion Option would require us to read Paragraphs 7 and 8 as overriding the requirements of Paragraph 13.  It is true that the Cities Service, Williams and Smith farm-ins were acquired by Exxon by the drilling of a well, and that if CMR had participated in the drilling of the farm-in well it would have owned a working interest in the farm-in area.  However, to interpret the Conversion Option as applying to the overriding royalty interests attributable to these farm-ins would give CMR a means of by-passing the provisions of Paragraph 13.  In other words, CMR's reading would allow them to acquire, without risk or expense, one-half of the working interest Paragraph 13 requires them to pay for.  We see nothing in the terms of the Conversion Option at Payout that supports such a conclusion.

In addition, we see no basis in the language of the Conversion Option to apply it to properties separately acquired by Exxon via the operation of Paragraph 13.  The Conversion Option gives the holder of the overriding royalty interest the right to exchange the overriding royalty for one-half of the working interest they would have owned if they had participated in the drilling of the well. Because the Conversion Option derives from Paragraphs 7 and 8, we read the "drilling participation" the option refers to as participation under Paragraphs 7 and 8 and the interests referred to as interests in properties jointly contributed by the parties, as to which the forfeiture and conversion options

---

[9]  Based on footnote 11 from *Exxon I*, it is not entirely clear whether CMR was given an opportunity to participate in the farm-ins, either by failure of notice by Exxon or as a result of CMR's decision not to participate in the first exploratory well by which act CMR forfeited their right to participate in related development wells.  CMR raises no issue in this regard and there is no dispute that CMR did not in fact participate in the Cities Service, William and Smith farm-ins.

apply. As the Cities Service, Williams and Smith farm-ins were not jointly contributed by the parties, drilling participation for acquisition purposes is governed by Paragraph 13 and the Conversion Option at Payout does not apply to overriding royalty interests attributable to those properties.[10]

## IV.

For the reasons stated above, we affirm the district court's judgment in part, reverse in part and remand this case to the district court for entry of judgment consistent with this opinion.

AFFIRMED IN PART. REVERSED IN PART. REMANDED.

---

[10] Exxon argues that CMR is judicially estopped from claiming a working interest in the Cities Service, Williams and Smith farm-ins. Because we decide the issue on the merits in Exxon's favor, we need not address that issue. However, our review of the record convinces us that the district court did not abuse its discretion in declining to apply the judicial estoppel doctrine in this instance.